**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FERNANDO ZEVALLOS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No.:  13-0390 (RC) |
| | : | |
| v. | : | Re Document Nos.:  8, 11, 12 |
| | : | |
| BARACK H. OBAMA, | : | |
| In his official capacity as | : | |
| President of the United States, | : | |
| | : | |
| JACOB J. LEW, | : | |
| In his official capacity as | : | |
| Secretary of the Treasury, | : | |
| | : | |
| and | : | |
| | : | |
| UNITED STATES | : | |
| DEPARTMENT OF THE TREASURY | : | |
| OFFICE OF FOREIGN ASSETS CONTROL | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

**GRANTING DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

In 2004, President George W. Bush designated Fernando Zevallos as a "Significant Foreign Narcotics Trafficker" under the Foreign Narcotics Kingpin Designation Act.  Mr. Zevallos brings this action, challenging the government's 2013 decision not to delist him as such, under the Due Process Clause, the Takings Clause, and the Administrative Procedure Act.  For

the reasons that follow, the Court will grant the defendants' motion to dismiss, or in the
alternative, for summary judgment.

## II.  FACTUAL BACKGROUND

### A.  Statutory Background

In 1999, Congress enacted the Foreign Narcotics Kingpin Designation Act ("Kingpin
Act").  *See* Foreign Narcotics Kingpin Designation Act, Pub. L. 106-120 (codified at 21 U.S.C.
§§ 1901–08 (1999)).  The purpose of the Act is "to provide authority for the identification of,
and application of sanctions on a worldwide basis to, significant foreign narcotics traffickers,
their organizations, and the foreign persons who provide support to those significant foreign
narcotics traffickers and their organizations, whose activities threaten the national security,
foreign policy, and economy of the United States."  21 U.S.C. § 1902.

The Kingpin Act authorizes the President to "identify[] publicly the foreign persons that
the President determines are appropriate for sanctions . . . and detail[] publicly the President's
intent to impose sanctions upon these significant foreign narcotics traffickers pursuant to this
chapter."  21 U.S.C. § 1903(b)(1)–(2).  A significant foreign narcotics trafficker ("SFNT") is
defined as "any foreign person that plays a significant role in international narcotics trafficking,
that the President has determined to be appropriate for sanctions pursuant to this chapter . . . ."
*Id.* § 1907(7).  Once a person has been designated an SFNT, "there are blocked . . . all such
property and interests in property within the United States, or within the possession or control of
any United States person, which are owned or controlled by" the SFNT.  *Id.* § 1904(b).

A person designated an SFNT may "seek administrative reconsideration of his, her or its
designation . . . or assert that the circumstances resulting in the designation no longer apply, and
thus seek to have the designation rescinded . . . ."  31 C.F.R. § 501.807.  Administrative

reconsideration is handled by the Office of Foreign Assets Control ("OFAC"), which is an agency within the Department of the Treasury. *Id.* § 501.807(b). That same regulation also provides that "[a] blocked person seeking unblocking . . . may request a meeting with the Office of Foreign Assets Control; however, such meetings are not required, and the office may, at its discretion, decline to conduct such meetings prior to completing a review pursuant to this section." *Id.* § 501.807(c). Additionally, the regulation states that "[a]fter the Office of Foreign Assets Control has conducted a review of the request for reconsideration, it will provide a written decision to the blocked person . . . ." *Id.* § 501.807(d).

## B. Fernando Zevallos's Personal History

The plaintiff, Fernando Zevallos, was born in Peru in 1957. Pl.'s Opp'n Mot. to Dismiss 5, ECF No. 12-1. Mr. Zevallos attended Peruvian Air Force officers' school in the 1970s, and, along with his family, started an air-taxi company called TAUSA in 1978. *Id.* In the early 1990s, Mr. Zevallos and his family terminated TAUSA and launched Aero Continente, a Peruvian airline. *Id.* The success of the airline caused Mr. Zevallos to apply for permanent residency status in the United States, which was granted in 1994. *Id.* at 6.

Since the 1990s, Mr. Zevallos has been charged with drug trafficking related crimes by at least three countries: Peru, Chile, and the United States. In 1995, the Peruvian National Police arrested several individuals on drug trafficking charges, who allegedly had ties to Aero Continente, and, in turn, to Mr. Zevallos as well. *Id.* Peruvian authorities initially found all the charges against Mr. Zevallos unfounded and absolved him of all criminal charges in 2002. But the Supreme Court of Peru ordered a new trial in 2003. *Id.* at 7–8. The retrial in Peru eventually led to Mr. Zevallos's conviction in 2005 for drug trafficking offenses, for which he is currently serving a 20-year prison sentence. *Id.* at 8. *See also* Def.'s Mot. to Dismiss 9, ECF No. 11-1.

Meanwhile, in 2001, Chile filed a money laundering case against him and Aero Continente, *see* Pl.'s Opp'n Mot. to Dismiss 6–7, and in 2007, Mr. Zevallos was indicted in the Southern District of Florida for alleged conspiracy, money laundering, and substantive violations of the Kingpin Act. *Id.* at 8. Finally, new charges were brought against him in Peru in 2011 and 2012, on allegations that Mr. Zevallos engaged in a criminal conspiracy, narcotics trafficking, and money laundering. *Id.* at 9. *See also* AR000343–346, AR000470, ECF No. 7-3.

### C. The Designation and Correspondence between Mr. Zevallos and OFAC

On June 1, 2004, pursuant to the Kingpin Act, President George W. Bush designated Mr. Zevallos an SFNT. *See* Compl., Ex. 3, ECF No. 1-3. In response, on December 23, 2004, Mr. Zevallos submitted a letter to OFAC challenging that designation.[1] AR000015, ECF No. 6-1. On June 24, 2005, and September 15, 2005, the Department of Justice provided Mr. Zevallos with redacted, unclassified information relied upon by OFAC in reaching its designation decision. *See* AR000469, AR000480, ECF No. 6-3. On October 17, 2005, Mr. Zevallos submitted supplemental arguments in support of his reconsideration request. AR001004, ECF No. 7-5. He did not receive a response from OFAC, and on November 9, 2005, he filed a complaint in the U.S. District Court for the District of Columbia challenging his designation. *See Zevallos v. Bush*, Civ. No. 05-2196 (D.D.C. Nov. 9, 2005), ECF No. 1. On December 21, 2005 (two days after his conviction in Peru of all charges for narcotics trafficking and money laundering), he voluntarily dismissed that complaint. *See* AR001235, ECF No. 7-7; *Zevallos v. Bush*, Civ. No. 05-2196 (D.D.C. Dec. 21, 2005), ECF No. 7. At that point, OFAC assumed that

---

[1] Mr. Zevallos also submitted a written request to OFAC on November 24, 2004, asking to inspect and copy the record upon which OFAC made its determination, but before he received a response from OFAC, he submitted the December 23, 2004 request to remove his designation. *See* Am. Compl. ¶¶ 17–18, ECF No. 10-1.

the voluntary dismissal of Mr. Zevallos's lawsuit also constituted a withdrawal of his request for reconsideration. *See* Def.'s Mot. to Dismiss 21, ECF No. 11-1, Def.'s Reply 8, ECF No. 14.

On July 8, 2009, Mr. Zevallos submitted a letter to OFAC renewing his request for reconsideration of his designation as an SFNT. *See* AR001236, AR001203–1207. In response to that, on October 2, 2009, OFAC sent Mr. Zevallos a questionnaire, to which he replied on November 2, 2009. AR001236. On May 15, 2010, Mr. Zevallos submitted a letter to OFAC requesting a response to his November 2009 letter. *Id.* On February 25, 2011, and also on October 17, 2012, Mr. Zevallos submitted letters to OFAC requesting a decision on his delisting petition. AR001237. On November 20, 2012, OFAC replied to Mr. Zevallos's October 17, 2012 letter, acknowledging its receipt. *Id.* Finally, on March 13, 2013, OFAC submitted another letter to Mr. Zevallos providing him with a status update, informing Mr. Zevallos that it "hope[d] to reach a final decision in the near future." *Id. See also* AR000894.

Mr. Zevallos then filed this lawsuit on March 25, 2013, initially asking this Court to enter an order compelling OFAC to issue a written decision as to Mr. Zevallos's continued SFNT designation. *See* Compl. 14, ECF No. 1. On June 14, 2013, OFAC issued a 44-page Evidentiary Memorandum denying Mr. Zevallos's reconsideration request. *See* AR001229–1281, ECF No. 7-7. Mr. Zevallos then amended his complaint, seeking instead an order from this Court compelling OFAC to remove his name from the Specially Designated Nationals list. *See* Am. Compl. 20, ECF No. 10. The defendants moved to dismiss each claim. They also moved for summary judgment in the alternative, as to Counts I (Procedural Due Process), II (Substantive Due Process), and V (Arbitrary and Capricious under the APA). They also argue that Counts III (Takings) and IV (Undue Delay) should be dismissed for lack of subject matter jurisdiction. *See* Def.'s Mot. to Dismiss 3–4, ECF No. 11-1. The Court now turns to the relevant legal standards.

### III. ANALYSIS

### A. Legal Standards

#### 1. Motion to Dismiss for Lack of Subject Matter Jurisdiction (12(b)(1))

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). It is the plaintiff's burden to establish that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Because subject matter jurisdiction focuses on the Court's power to hear a claim, the Court must give the plaintiff's factual allegations closer scrutiny than would be required for a 12(b)(6) motion for failure to state a claim. *See Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Thus, the court is not limited to the allegations contained in the complaint. *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987).

#### 2. Motion to Dismiss for Failure to State a Claim (12(b)(6))

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. FED. R. CIV. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). A court considering such a motion presumes that the

complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). It is not necessary for the plaintiff to plead all elements of her prima facie case in the complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

### 3. Summary Judgment

With respect to the constitutional claims at issue in this case, the standard for summary judgment that governs is found in Fed. R. Civ. P. 56, which explains that a court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

However, with respect to the APA claims in this case, the summary judgment standard is different, "because of the limited role of a court in reviewing the administrative record." *See Kadi v. Geithner*, No. 09-cv-108, 2012 WL 898778, at *4 (D.D.C. March 19, 2012). When assessing a summary judgment motion in an APA case, "the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The entire case on review is a question of law, and only a question of law." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). In an APA case, then, "[s]ummary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Kadi*, 2012 WL 898778, at *4.

## B.  Standard of Review under the APA[2]

Under the APA, an agency decision should be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  "[T]he ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  *Id.* As the Supreme Court has since elaborated, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  *Accord Holy Land Found. for Relief & Dev. v. Ashcroft ("Holy Land I")*, 219 F. Supp. 2d 57, 67 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003)

---

[2]     The plaintiff argues that this Court should engage in *de novo* review under 5 U.S.C. § 706(2)(F) .  *See* Am. Compl., Count VII, ECF No. 10-1.  In *Citizens of Overton Park v. Volpe*, the court explained that "de novo review . . . is authorized by § 706(2)(F) in only two circumstances.  First, such *de novo* review is authorized when the action is adjudicatory in nature and the agency fact-finding procedures are inadequate.  And, there may be independent judicial fact-finding when issues that were not before the agency are raised in a proceeding to enforce non-adjudicatory agency action."  401 U.S. 402, 415 (1971).  The Supreme Court has never clearly articulated what inadequate fact-finding procedures are, but the D.C. Circuit has stated that "the procedures must be severely defective before a court proceeding under the APA can substitute de novo review for review of the agency's record."  *Nat'l Org. for Women v. Social Sec. Admin.*, 736 F.2d 727, 745 (D.C. Cir. 1984).  *Accord Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 513 F. Supp. 2d 190, 198 (M.D. Pa. 2007) (noting that "[d]e novo review is reserved for the extraordinary case" and explaining in a footnote that there are almost no federal cases in which courts have used either of the *Overton Park* exceptions to review agency action de novo).  In light of the sheer dearth of cases applying the de novo standard of review, this Court does not find such a standard applicable.  This is not an extraordinary case where no fact-finding procedures at all were used—on the contrary, OFAC has submitted a lengthy administrative record showing the relevant facts it has collected over the years regarding Mr. Zevallos, and upon which it relied in reaching its decision.  As such, the Court will review this case under the arbitrary and capricious standard of review.

9

("the Court must review the administrative record assembled by the agency to determine whether its decision was supported by a rational basis").

"[I]f OFAC's actions were not arbitrary and capricious and were based on substantial evidence,"[3] the Court must uphold OFAC's decision. *Holy Land Found. for Relief & Dev. v. Ashcroft ("Holy Land II")*, 333 F.3d 156, 162 (D.C. Cir. 2003); *Islamic Am. Relief Agency v. Gonzales ("Islamic Am. Relief Agency II")*, 477 F.3d 728, 732 (D.C. Cir. 2007). The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given," and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974). "Once assured the [agency] has engaged in reasoned decisionmaking, it is not for [the Court] to reweigh the conflicting evidence or otherwise to substitute [its] judgment for that of the [agency]." *Ind. Mun. Power Agency v. FERC*, 56 F.3d 247, 254 (D.C. Cir. 1995). *See also Pub. Citizen Health Res. Grp. v. Tyson*, 796 F.2d 1479, 1495 (D.C. Cir. 1986) ("Our function . . . is only to search for *substantial* evidence, not proof positive. Furthermore, we do not reweigh the evidence and come to our own conclusion; rather, we assess the reasonableness of [the agency]'s conclusion." (emphasis in original)).

In addition to the deference accorded to agency action under the APA, in the special context of an executive designation like the one at issue in this case, the D.C. Circuit has suggested that an even more deferential review applies when matters of foreign policy and

---

[3]     In the D.C. Circuit, "the substantial evidence test and the arbitrary or capricious test are one and the same." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984). *See id.* at 684 ("We have noted on several occasions that the distinction between the substantial evidence test and the arbitrary or capricious test is 'largely semantic . . . .'"). *See also Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1310 (D.C. Cir. 2010) ("We will vacate an agency's decision as arbitrary and capricious if [its] factual determinations lack substantial evidence . . . ." (first alteration in original) (internal quotation marks omitted)).

national security are concerned.  *See Islamic Am. Relief Agency II*, 477 F.3d at 734 ("we reiterate

that our review—in an area at the intersection of national security, foreign policy, and

administrative law—is extremely deferential").  *Accord Kadi*, 2012 WL 898778, at *6;  *Zarmach*

*Oil Servs., Inc. v. Dep't of Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("courts owe a

substantial measure of deference to the political branches in matters of foreign policy, including

cases involving blocking orders" (citation omitted)).

## C.  APA Claims Analysis (Counts IV, V, VI, VII)

### 1.  OFAC's Decisions were not Arbitrary and Capricious

It is not clear that the plaintiff challenges his 2004 designation in the current action.  *See*

Am. Compl. ¶¶ 90, 97.  Even if he does challenge that designation here, it is not clear such a

challenge would be timely, as the APA catch-all statute of limitations is six years.[4]  Regardless,

the Court finds such a challenge would fail on the merits.

It is clear, however, that Mr. Zevallos challenges OFAC's decision not to remove his

SFNT designation on June 14, 2013.  *See* Am. Compl. ¶ 90, p. 20-21.  The Court finds that that

OFAC decision was not arbitrary and capricious, but rather, that there was a "rational connection

between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at

43.

---

[4]      *See* 28 U.S.C. § 2401(a) ("every civil action against the United States shall be
barred unless the complaint is filed within six years after the right of action first accrues");
*P & V Enterprises v. U.S. Army Corps of Engineers*, 466 F. Supp. 2d 134, 143 (D.C. Cir. 2006)
("facial challenges to agency regulations like any other civil action filed against the United
States, are subject to § 2401(a)'s six-year limitations period");  *James Madison Ltd. by Hecht v.*
*Ludwig*, 82 F.3d 1085, 1094 (D.C. Cir. 1996) (explaining that the APA "carries a six-year statute
of limitations").

*a. 2004 Designation*

With respect to Mr. Zevallos's initial 2004 designation, OFAC relied on, *inter alia*, the following (*see* AR000481–491, ECF No. 7-3) in reaching its SFNT designation decision: (1) a 2002 DEA Investigation Report, *see* AR000055–74, ECF No. 7-1, which chronicles narcotics trafficking charges brought against Mr. Zevallos by Peruvian officials as early as 1982; (2) other letters and reports from the DEA Lima's office regarding Mr. Zevallos's involvement with narcotics trafficking in Latin America, *see, e.g.*, AR000627–629, AR000633–637, ECF No. 6-4; (3) Peruvian Superior Court trial documents, *see* AR000084–90, charging him with narcotics trafficking, and depositions related to those charges, *see* AR000670–702; (4) Chilean criminal court charging documents, *see* AR000158–241, ECF No. 7-2, and (5) dozens of newspaper articles and letters chronicling his involvement with narcotics trafficking, money laundering, corruption, and murder for a period of over twenty years. *See, e.g.*, AR000706, AR000902–957, AR001022–1049.[5]

The 2002 DEA report explained that Zevallos had been subject to extensive investigations by the Peruvian police, including being arrested on at least three occasions for narcotics trafficking in the 1980s. AR000055. The Peruvian Superior Court's Indictment stated that Mr. Zevallos used his company, Aero Continente, "to systematically introduce property and capital valued at approximately $43 million US dollars, consisting of 12 airplanes, in the period from 1992 to 1995 . . . from which it can be concluded that his fortune came from the illicit trafficking of narcotics . . . ." AR000089. The Chilean criminal court's charging instrument

---

[5]     Many of the newspaper articles are dated after the June 1, 2004 designation (*see* AR000488–491) and therefore could not have provided the basis for OFAC's decision pre-June 1, 2004. Notwithstanding that observation, the Court finds that OFAC has still provided substantial evidence from the pre-2004 materials. Moreover, the articles dated after 2004 support OFAC's *2013* denial of Mr. Zevallos's delisting petition.

similarly chronicles Mr. Zevallos's involvement in narcotics trafficking since at least 1982. *See* AR000222. Moreover, on May 30, 2003, the Peruvian Supreme Court ordered a new trial in Mr. Zevallos's case, for which he was ultimately convicted, and for which he is currently serving a 20-year prison sentence in Peru for narcotics trafficking. *See* Pl.'s Opp'n Mot. to Dismiss 6-8; AR001251–1253, AR000320–324. Those documents thus provide substantial evidence from which OFAC concluded that Mr. Zevallos "plays a significant role in international narcotics trafficking." 21 U.S.C. § 1907(7).

The newspaper articles further corroborate the conclusion that Mr. Zevallos is a significant foreign narcotics trafficker. *See, e.g.*, AR000331–334. Specifically, one article discusses a police manifest where Zevallos confesses to being a drug trafficker. AR000371, AR00375, ECF No. 7-3. Several other articles discuss Mr. Zevallos's connections to various intimidation tactics employed—including murder or the threat thereof—against would-be witnesses against him and judges involved in his cases. *See* AR000376–389, 000398–449. *See also* AR001243–1249.

When viewed as a whole, the record shows that the foreign trial court documents, newspaper articles, and DEA reports and documentation all provide substantial evidence from which OFAC concluded that Mr. Zevallos "plays a significant role in international narcotics trafficking," and warranted designation as an SFNT in June 2004. 21 U.S.C. § 1907(7). OFAC's initial designation, to the extent it even is, or can be challenged here, was nevertheless supported by a rational basis, and was not arbitrary and capricious.[6]

---

[6] Mr. Zevallos contests OFAC's reliance on "recent criminal charges and open source news publications to justify the continued designation of Plaintiff." Pl.'s Opp'n Mot. to Dismiss 2, ECF No. 12-1. *See also* Pl.'s Reply 6, ECF No. 16. However, it is axiomatic that "[a]gency designations can be based on a broad range of evidence including news reports, intelligence data, and hearsay declarations." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219

*b. 2013 denial of delisting decision*

With respect to OFAC's 2013 decision, Mr. Zevallos argues that his continued designation is arbitrary and capricious because he is incarcerated in Peru, serving a sentence that will last until 2025, and therefore, by definition, cannot *currently* drug traffic, as required by the Kingpin Act. *See* Pl.'s Opp'n Mot. to Dismiss 15. OFAC admits, and the Court agrees, that its evidence on the continued designation of Mr. Zevallos in 2013 is sparser than the evidence it amassed in reaching its initial designation decision in 2004. *See* Def.'s Mot. to Dismiss 19. Specifically, OFAC relied on: (1) 2007 U.S. criminal charges brought against Mr. Zevallos for violations of the Kingpin Act; (2) the freezing of Panamanian bank accounts in Mr. Zevallos's name; (3) 2011 and 2012 Peruvian court activity; (4) newspaper articles demonstrating Mr. Zevallos's continued control of his assets despite his current incarceration; and (5) newspaper articles indicating that Mr. Zevallos was recently found with a cell phone in his prison cell. *See* AR001268–1271.

The Court finds that OFAC has still provided substantial evidence for its decision, and as such that its denial of Mr. Zevallos's delisting petition was not arbitrary and capricious. *See Zarmach Oil Servs.*, 750 F. Supp. 2d at 154 ("An agency's decision need not be a model of analytic precision to survive a challenge and a reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (citation omitted)). *See also Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 979 (9th Cir. 2012) ("we acknowledge that the unclassified record is not overwhelming, but we reiterate our review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential") (quoting *Islamic Am. Relief Agency II*, 477 F.3d at 734).

---

F. Supp. 2d 57, 71 (D.D.C. 2002) (citing *Nat'l Council for Resistance of Iran v. Dep't of State*, 251 F.3d 192, 196 (D.C. Cir. 2001)).

With respect to the cell phone, the May 7, 2013, newspaper article that OFAC relied on explained that not only was Mr. Zevallos found with a cell phone in his prison cell, but so was another inmate named Jorge Chavez Montoya, who was "also sentenced for drug trafficking and accused of being a drug trafficker." AR001176.[7] OFAC relied on other newspaper reports, citing incidents throughout Latin America where narcotics prisoners have continued to traffic drugs through the use of cell phones, despite their incarceration. AR001179–001186, 001195. That two narcotics-trafficking inmates, who had previously worked together, were found with cell phones supports OFAC's conclusion that delisting Mr. Zevallos was not appropriate.[8]

Although Mr. Zevallos focuses on the speculativeness of the cell phone evidence, the cell phone was not the only piece of evidence that OFAC relied on in making its continued designation determination. OFAC also relied on newspaper articles explaining that despite Mr. Zevallos's current incarceration, he remains in control of assets and many properties throughout his network, including 42 properties and 14 vehicles in Peru, *see* AR000338–339, and two Panamanian bank accounts totaling eight million dollars, *see* AR001086–1089. It also relied on Mr. Zevallos's 2007 Indictment in the Southern District of Florida for money laundering, and violations of the Kingpin Act's prohibition on transfer, use, and dealing in property in which Mr.

---

[7]    OFAC explained that "there is reason to believe that the two men know each other very well and have maintained a friendship or business relationship for many years" and that Chavez Montoya was thought to be one of Mr. Zevallos's "right hand men." AR001262 (citing newspaper articles and a 1995 S.D. Fla. Indictment of Jorge Chavez Montoya, in which he pled guilty to one count of conspiracy to import cocaine).

[8]    "The 'substantial evidence' standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002) (citing *Whitmore v. AFIA Worldwide Ins.*, 837 F.2d 513, 515 n.4 (D.C. Cir. 1988)). "When reviewing for substantial evidence, [the Court does] not ask whether the record could support the petitioner's view of the issue, but whether it supports the [agency]'s ultimate decision. The substantial evidence inquiry turns not on how many discrete pieces of evidence the [agency] relies on, but on whether that evidence adequately supports its ultimate decision." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010) (citation omitted).

Zevallos has an interest.  *See* AR001236, AR001268; Criminal Indictment ¶¶ 5-10, *USA  v. Zevallos-Gonzales, et al.*, 07-cr-20587, July 7, 2007 (S.D. Fla) (listing Mr. Zevallos's numerous real property interests in Miami, Florida), ECF No. 1.  In addition, OFAC relied on a newspaper article explaining that one of Mr. Zevallos's "shadow advisors" was investigated for fraud in connection with a mansion controlled, owned, or both, by Mr. Zevallos in Peru, *see* AR000604–607, and newspaper articles describing drug trafficking charges Mr. Zevallos currently faces in Peru, for, *inter alia*, drug trafficking and money laundering acts committed between 1998 and 2006.  *See* AR001269.  *See also* AR000470, AR000343–344.  Finally, OFAC relied on the fact that OFAC has, as late as 2009, blocked the assets of 26 other companies and 14 individuals tied to Mr. Zevallos.  *See* AR001127, ECF No. 7-6.  That individuals and businesses connected to Mr. Zevallos are still engaging in narcotics trafficking—despite Mr. Zevallos's incarceration— thus provides a rational basis from which OFAC concluded that Mr. Zevallos "plays a significant role in international narcotics trafficking."  21 U.S.C. §1907(7).

Importantly, the Kingpin Act defines narcotics trafficking as "any illicit activity to cultivate . . . *sell, finance*, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, *or to assist, abet, conspire, or collude with others to do so*." (emphasis added).  The Congressional record also notes that "[t]he targets of this legislation are not only the drug kingpins, but those involved in their illicit activities, such as: *money laundering* . . . transporting narcotics from the drug source countries to the United States, and *managing the assets* of these criminal enterprises."  H.R. REP. NO. 106-457, at 43 (emphasis added).  Thus, OFAC relied on evidence pointing to both Mr. Zevallos's involvement with drug trafficking itself, as well as his connection to the laundering and management of assets tied to

drug trafficking (including his own prior drug trafficking), both of which formed a rational basis for OFAC's decision.

Viewing the post-designation record as a whole, the Court finds that OFAC relied on substantial evidence in reaching its determination that delisting Mr. Zevallos as an SFNT was inappropriate. Notwithstanding his current incarceration, Mr. Zevallos is not off the radar, and is still able to communicate with family members and other potential drug traffickers in order to continue drug trafficking—but equally importantly—to continue managing and laundering his ill-gotten proceeds from his prior drug trafficking. OFAC thus had substantial evidence—evidence that "adequately supports its ultimate decision," *see Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010) (citation omitted)—to conclude that Mr. Zevallos "plays a significant role in international narcotics trafficking," and therefore that delisting him was not appropriate. 21 U.S.C. § 1907(7). As such, its decision was not arbitrary and capricious.[9]

---

[9] Mr. Zevallos argues that OFAC relied on "outdated, biased, and incredible sources," *see* Pl.'s Opp'n Mot. to Dismiss 17, as well as sources that are "baseless and inherently flawed due to their lack of credibility." *See* Pl.'s Reply 5. To support his claim of bias, Mr. Zevallos notes that the Chilean charges against him "came shortly after the failed attempt of Aero Continente's Chilean competitor, Lan Chile, to prevent Aero Continente's expansion into Chile," and that the President of the Board of Directors of Lan Chile's Peruvian affiliate is married to one of the main stockholders of El Comercio, the Peruvian newspaper relied upon by the defendants. *See* Pl.'s Opp'n Mot. to Dismiss 7. Mr. Zevallos made these arguments to OFAC, and OFAC concluded that the evidence before it *was* credible, as it explained in its 2013 Evidentiary Memorandum. *See* AR001239–1240, ECF No. 7-7. It is not the province of this Court to reweigh the evidence and reconsider Mr. Zevallos's arguments on appeal. *See, e.g.*, *Fla. Gas Transmission*, 604 F.3d at 645 ("When reviewing for substantial evidence, [the Court does] not ask whether the record could support the petitioner's view of the issue, but whether it supports the [agency]'s ultimate decision. The substantial evidence inquiry turns not on how many discrete pieces of evidence the [agency] relies on, but on whether that evidence adequately supports its ultimate decision." (citation omitted)). OFAC relied on a DEA report, DEA letters, Peruvian trial court documents, Chilean trial court documents, and countless newspaper articles including from sources other than El Comercio, all pointing to the fact that Mr. Zevallos's SFNT designation was appropriate. Even if a fraction of the newspaper articles were in fact, biased,

## 2. OFAC's 2013 Decision was not Unreasonably Delayed or Made Without Observance of Procedure

Mr. Zevallos also argues that under the APA, OFAC's re-designation decision was unreasonably delayed under 5 U.S.C. § 706(1) (Count IV), and made without observance of procedure in violation of 5 U.S.C. § 555(e) (Count VI). The plaintiff's first argument is moot because OFAC has issued its decision regarding Mr. Zevallos's designation—it has continued to list him as an SFNT. Though that is not the result Mr. Zevallos hoped for, it is still a decision. All this Court can do is "compel agency action . . . unreasonably delayed," i.e., compel OFAC to issue *a* decision—which it has already done. 5 U.S.C. § 706(1). The Court must therefore dismiss Mr. Zevallos's claim on this issue under Fed. R. Civ. P. 12(b)(1). [10]  *See Ctr. for Biological Diversity v. Kempthorne*, 498 F. Supp. 2d 293, 296 (D.D.C. 2007) ("The court will lack subject matter jurisdiction if the plaintiff's claim is moot"). *See also Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) ("Even where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'").

The plaintiff's procedural error claim also fails. 5 U.S.C. § 555(e) requires that prompt notice be given "of the denial in whole or in part of a written application, petition, or other

---

they were not the only evidence relied upon by OFAC in making its decision—the evidence OFAC relied upon  as a whole "adequately supports its ultimate decision," *see id.*, and therefore the Court must uphold that determination.

[10]      In the alternative, OFAC argues that the undue delay claim should be dismissed for failure to state a claim, as the regulations governing OFAC's procedures do "not establish a time frame within which OFAC must issue a decision on a delisting petition." Def.'s Mot. to Dismiss 21, ECF No. 11-1.  The Court need not decide the question of whether "slightly less than four years," *see id.* at 21–22, is an unreasonable amount of time for OFAC to deliberate on a designation decision, because either way, as set forth above (1) the undue delay claim is moot because OFAC has issued a decision, and (2) any undue delay would result in harmless error.

request of an interested person made in connection with an agency proceeding." Mr. Zevallos received prompt notice of OFAC's June 14, 2013 decision. *See* Def.'s Mot. to Dismiss 23 n.9; Am. Compl. ¶ 39. Along with OFAC's decision, he also received a "memorandum setting forth the reasons for the denial, with citations to numerous exhibits." *Id.* OFAC thus gave Mr. Zevallos notice of the denial of his petition, which included "a brief statement of the grounds for denial." 5 U.S.C. § 555(e). Therefore, there was no procedural error as to his notification of OFAC's decision.

Moreover, even if the Court were to find undue delay or procedural error here, such errors are harmless. "The harmless error rule applies to agency action because if the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) (citations omitted). Here, any delay or procedural error did not affect the outcome for Mr. Zevallos. When OFAC finally made its delisting decision in 2013, it found once again, that Mr. Zevallos merited designation as an SFNT. As such, whether OFAC took one month, one year, or one decade to decide his case, the length of time it took did not change the outcome for him at all—OFAC's decision to designate him an SFNT, in light of a substantial record of evidence against him spanning the 1980s to 2013, remained the same.[11]

---

[11] Mr. Zevallos contends that his current incarceration in Peru is a result of his SFNT designation, *see* Pl.'s Opp'n Mot. to Dismiss 2, ECF No. 12-1, and that he has also suffered reputational and business harm as a result. *Id.* at 2–3, 19 ("But for Plaintiff's designation as a[n] SFNT, such harms would not have been inflicted and would not be ongoing."). However, Mr. Zevallos began serving a 20-year prison sentence in 2005 because of a conviction in Peruvian court, arising out of a Peruvian investigation, and based on Peruvian charges brought against him in 1995—unrelated to his U.S. designation. Thus, his current situation is not the result of the 2004 designation at all (or even the 2013 re-designation), but a result of charges brought against him in another country pre-designation. It is unclear that the relief plaintiff ultimately seeks—delisting him as an SFNT—would have any effect on his reputation or business interests, as the previous conviction and ongoing proceedings against him

The defendants moved to dismiss all the APA claims, and, in the alternative, moved for summary judgment on the arbitrary and capricious APA claim (Count V). Because the Court finds that OFAC's decisions were not arbitrary and capricious, the Court must enter judgment for OFAC as to Count V. Because the Court finds no procedural error here, and finds de novo review unwarranted, it must dismiss Counts VI and VII under Fed. R. Civ. P. 12(b)(6). Because the Court finds that Count IV (undue delay) is moot, it must dismiss the claim for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

### D. Constitutional Claims (Counts I, II, III)

Mr. Zevallos also brings constitutional claims under the Fifth Amendment's Due Process Clause and the Fifth Amendment's Takings Clause. The Court now turns to those claims.[12]

#### 1. Procedural Due Process (Count I)

Mr. Zevallos's first constitutional challenge to his designation as an SFNT is on procedural due process grounds. He argues that under the Fifth Amendment, he was entitled to notice and hearing before his designation, or in the alternative, that he was entitled to more robust process post-designation. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth . . . Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The fundamental requirement of [procedural] due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333. In determining the amount of process due, the Court is to consider and balance three factors: "First, the private interest that

---

in Peru contribute in large part to his current reputational and business predicament. For instance, Mr. Zevallos is currently facing other charges in Peru that could result in his incarceration for 35 more years after he is released in 2025. *See* AR000343–346, ECF No. 7-3.

[12] Although Mr. Zevallos is a foreign national whose lawful permanent residency status was revoked on March 9, 2004, before his designation as an SFNT on June 1, 2004, *see* AR000082–83, ECF No. 7-1, OFAC does not challenge plaintiff's standing to bring this suit.

will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

What process is due, and when, before OFAC makes an SFNT designation, are both issues of first impression in this Circuit under the Kingpin Act. However, the D.C. Circuit has had occasion to consider these issues in cases brought under the International Emergency Economic Powers Act ("IEEPA"), and this Court finds such an analogy appropriate here. The IEEPA, 50 U.S.C. § 1701 *et seq.*, was enacted in 1977 and it "authorizes the President to declare a national emergency when an extraordinary threat to the United States arises that originates in substantial part in a foreign state." *Holy Land II*, 333 F.3d at 159 (citing 50 U.S.C. § 1701 *et seq.*). Specifically, it allows the President to exercise sanction powers to deal with a threat "to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Under 50 U.S.C. § 1702(a)(1)(B), "the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit . . . any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . ." In 1995, President Clinton, acting pursuant to the IEEPA, issued Executive Order 12,978, which declared a national emergency resulting from international narcotics trafficking centered in Colombia, finding that "the actions of significant foreign

narcotics traffickers centered in Colombia, and the unparalleled violence, corruption, and harm that they cause in the United States and abroad, constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States . . . ."  *See* Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers, 60 Fed. Reg. 54,579, 54,579 (Oct. 21, 1995).

The Kingpin Act was largely based on the success of the IEEPA and Executive Order 12,978 in crippling the Colombian drug cartels.  *See* 21 U.S.C. § 1901(a)(3) ("IEEPA was successfully applied to international narcotics traffickers in Colombia and based on that successful case study, Congress believes similar authorities should be applied worldwide.").  As the House Conference Report explains, "[t]he legal precedent for this title [the Kingpin Act] was the successful application of sanctions in 1995 and 1996 against the Cali Cartel narco-trafficking organization and its key leaders."  H.R. REP. NO. 106-457, at 43 (1999) (Conf. Rep.), *reprinted in* 1999 U.S.C.C.A.N. 304, 314.  Thus, Congress intended to model the Kingpin Act off of the success of the IEEPA, and therefore cases establishing due process rights under the IEEPA are instructive here.

More importantly, the process being challenged here is the same under the IEEPA as it is under the Kingpin Act—that outlined in 31 C.F.R. § 501.807.  This is because a designation under either statute results in the person or entity's name being published on the same "Specially Designated Nationals" list.  *See* 31 C.F.R. Ch. V, App. A ("OFAC maintains on its Web site [sic] a list of blocked persons, blocked vessels, specially designated nationals, specially designated terrorists, specially designated global terrorists, foreign terrorist organizations, and specially designated narcotics traffickers . . . [t]his Specially Designated Nationals and Blocked Persons List is updated frequently . . . .").  The legal consequence of this list is that OFAC's

designation-challenging procedures for such persons designated, under both the IEEPA and the

Kingpin Act, are identical. *See* 31 C.F.R. § 501.807(a) ("A person blocked under the provisions

of any part of this chapter, including a specially designated national, specially designated

terrorist, or specially designated narcotics trafficker (collectively, a 'blocked person') . . . may

submit arguments or evidence that the person believes establishes that insufficient basis exists

for the designation.").[13]  Moreover, Mr. Zevallos has not identified how, if at all, the property or

---

[13]     Mr. Zevallos argues that the Kingpin Act and the IEEPA are significantly different statutes and that likening the IEEPA's procedures to the Kingpin Act is not appropriate. *See* Pl.'s Opp'n Mot. to Dismiss 14–15.  In support, Mr. Zevallos cites *Stansell v. Revolutionary Armed Forces of Colombia*, 704 F.3d 910 (11th Cir. 2013) and *World Fuel Corp. v. Geithner*, 568 F.3d 1345 (11th Cir. 2009).  In *Stansell*, the court held that "blocked assets" under the Anti-Terrorism Act did not constitute "blocked assets" under the Kingpin Act.  704 F.3d at 917.  That court rejected the appellee's argument that because the Kingpin Act was "expressly modeled on the Economic Powers Act and was birthed from that statute's successful execution . . . an asset seized or frozen under the Kingpin Act is by definition an asset seized or frozen under the Economic Powers Act."  *Id.* at 914–15.  The *Stansell* court found that "[s]imilarities between laws . . . do not make them the same law.  The Kingpin Act is not the Economic Powers Act." *Id.* at 917.  That court's decision does not affect this Court's analysis because that case was not a case interpreting the process due under either statute, but rather, that case interpreted the phrase "blocked asset" under the Terrorism Act.  As such, its notation in dicta that the statutes are different does not persuade this Court that in the context of determining the process due under both statutes,—which the *Stansell* court did acknowledge are very similar—the analogy is not appropriate.

Meanwhile, in *World Fuel*, the Eleventh Circuit described in detail the district court's finding, in an unpublished opinion, that OFAC's procedure for denying a license was arbitrary and capricious because OFAC had used the same procedure for denying a license under the Kingpin Act that it engaged in for denying a license under the IEEPA.  568 F.3d at 1349.  The circuit court acknowledged the district court's order that "OFAC cannot use the same factors to evaluate license applications regardless of whether the funds were blocked under the Kingpin Act or the IEEPA."  *Id.* at 1348.  As the circuit court explained, the district court's remand decision was based on the fact that OFAC relied on licensing factors under the IEEPA that were irrelevant to the Kingpin Act—namely "presidential leverage" power with other countries, and "the protection of future creditors"—which, notwithstanding the similarities in the statutes, were irrelevant to the Kingpin Act.  *Id.* at 1347–48.  As such, the district court remanded the case to OFAC so that OFAC could establish the proper criteria under the Kingpin Act.  That decision, however, does not render the adoption of the IEEPA due process requirements inapplicable to the Kingpin Act.

The same rationale that justifies no pre-deprivation notice and hearing under the IEEPA also proves true for the Kingpin Act.  That is, pre-designation notice would undermine the

liberty interests implicated by the Kingpin Act require any different or additional procedural

protections than those implicated by the IEEPA.  Based on the connection between the two

statutes, the similar property and liberty interests implicated by both, and the identical procedural

regulations pertaining to them both, the Court finds that the due process required under the

IEEPA is the same process required under the Kingpin Act.

### a.  Pre-deprivation Process[14]

Under the IEEPA, courts generally hold that OFAC need not provide pre-deprivation

notice and hearing, given the government's compelling interest in the immediate blocking of

assets upon designation.  *See Kadi*, 2012 WL 898778, at *24 ("notice and a meaningful

opportunity to be heard are satisfied by the provision of a *post*-deprivation administrative remedy

and the opportunity to submit written submissions to OFAC, even where (as here) the initial

designation provided no notice or opportunity to be heard") (emphasis added) (citing *Holy Land*

*II*, 333 F.3d at 163–164);  *Islamic Am. Relief Agency v. Unidentified FBI Agents ("Islamic Am.*

*Relief Agency I")*, 394 F. Supp. 2d 34, 49–50 (D.D.C. 2005), *aff'd in part, remanded on other*

*grounds*, 477 F.3d 728 (D.C. Cir. 2007) ("the Court agrees with the defendants' position that the

plaintiff[s] were not entitled to pre-deprivation notice and a hearing" under the IEEPA); *Holy*

---

purpose of the Kingpin Act, which is to "protect the national security, foreign policy, and economy of the United States from the threat" that results "from the activities of international narcotics traffickers and their organizations," because it would alert the would-be designees in time to move their assets.  21 U.S.C. § 1901(b) & § 1901(a)(4).  Indeed, this concern is reflected in the Kingpin Act Congressional Record.  *See* H.R. REP. NO. 106-457, at 47 (1999) (Conf. Rep.), *reprinted in* 1999 U.S.C.C.A.N. 304, 318 (explaining that in the IEEPA context, "Federal courts have held that no pre-deprivation hearing is required in blocking of assets because of the Executive Branch's plenary authority to act in the area of foreign policy and the obvious need to take immediate action upon designation to avoid dissipation of affected assets.").  Thus, the plaintiff's arguments do not persuade this Court that the same due process procedures applicable to the IEEPA should not also govern in the context of the Kingpin Act.

[14]      As set forth above, it is unclear that Mr. Zevallos can, or does, challenge his 2004 designation (and therefore any procedural due process rights associated with that designation) in this action.

*Land I*, 219 F. Supp. 2d at 76–77 (finding no procedural due process violation where no pre-deprivation notice was given because, *inter alia*, "prior notice to such designated persons of measure to be taken . . . would render these measures ineffectual") (citations omitted); *Global Relief Found., Inc. v. O'Neill*, 207 F. Supp. 2d 779, 804 (N.D. Ill. 2002), *aff'd*, 315 F.3d 748 (7th Cir. 2002) ("Pre-deprivation notice would, in fact, be antithetical to the objectives of these sanctions programs, and, as a result, it is OFAC policy when initiating a blocking pursuant to IEEPA not to provide pre-blocking notice."). *See also Al Haramain Islamic Found.*, 686 F.3d at 985 ("As the district court noted, and as many courts have held, the potential for 'asset flight' almost certainly justifies OFAC's decision not to provide notice before freezing the assets.").

In reaching the determination that an IEEPA designation does not require pre-deprivation notice, those cases rely on the test articulated by the Supreme Court in *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974). *See Islamic Am. Relief Agency I*, 394 F. Supp. 2d at 49, *Holy Land I*, 219 F. Supp. 2d at 76; *Global Relief,* 207 F. Supp. 2d at 803.[15] In *Calero-Toledo*, the Court explained that "[first,] immediate seizure of a property interest, without an opportunity for prior hearing, is constitutionally permissible . . . [where] the seizure has been directly necessary to secure an important governmental or general public interest." *Id.* at 678. "Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official

---

[15]     And, as defendants note in their brief, Judge Kennedy, in an unpublished order on a motion for a temporary restraining order and a preliminary injunction, also applied the *Calero-Toledo* factors in finding that notice and hearing were likely not necessary pre-designation under the Kingpin Act. *See* Memorandum Opinion on Plaintiff's Application for a Temporary Restraining Order and Preliminary Injunction, *Aero Contintente, S.A., v. Newcomb*, No. 04-cv-1168 (D.D.C. July 16, 2004), ECF No. 8; also attached as Ex. A to Def.'s Mot. to Dismiss, ECF No. 11-2.

responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." *Id.*

Under the *Calero-Toledo* factors, even absent analogizing to IEEPA authority, OFAC did not need to provide pre-deprivation notice and hearing to comport with due process in this case involving the Kingpin Act. The "important governmental interest" and "special need for prompt action" are evidenced here by the Kingpin Act's Congressional record. *See* H.R. REP. NO. 106-457, at 47 (1999) (Conf. Rep.), *reprinted in* 1999 U.S.C.C.A.N. 304, 318 ("Federal courts have held [in the context of the IEEPA] that no pre-deprivation hearing is required in blocking of assets because of the Executive Branch's plenary authority to act in the area of foreign policy and the obvious need to take immediate action upon designation to avoid dissipation of affected assets."). In the context of the Kingpin Act, which is aimed at "bankrupt[ing] and disrupt[ing] the major narcotics trafficking organizations," the same sense of urgency predominates—there is an obvious need to take immediate action upon designation to avoid dissipation of affected assets. *See* H.R. REP. NO. 106-457, at 43. That is demonstrated in this case, where Mr. Zevallos's "property within the United States," *see* 21 U.S.C. § 1904(b), could easily be moved from the United States to elsewhere at a moment's notice—and in fact was, *see e.g.*, AR001061, AR001063–1064 (listing certain wire transfers *from* Miami, Florida to Lima, Peru). Thus, the first two *Calero-Toledo* factors—important government interest and special need for prompt action—are satisfied. The third factor is satisfied here because the Department of the Treasury, under the standards of the Kingpin Act and its promulgating regulations, issued the blocking order, thereby keeping "strict control over its monopoly of legitimate force." *Calero-Toledo*, 416 U.S. at 678. Thus, Mr. Zevallos was not entitled to a pre-deprivation notice and hearing— either under *Calero-Toledo*, or IEEPA authority.

*b. Post-deprivation Process*

Because the Court finds that pre-deprivation process is not necessary here, the question

becomes what post-deprivation process is due. This issue is also one of first impression in this

Circuit, and again, the context of the IEEPA provides a helpful analogy. As this Court recently

explained, "the D.C. Circuit in *Holy Land* . . . held that notice and a meaningful opportunity to be

heard are satisfied by the provision of a post-deprivation administrative remedy and the

opportunity to submit written submissions to OFAC, even where [] the initial designation

provided no notice or opportunity to be heard." *Kadi*, 2012 WL 898778, at \*24. *See also Holy*

*Land II*, 333 F.3d at 163 (explaining that under the IEEPA, the Secretary of the Treasury must

"afford to entities . . . at least in written form, such evidence as those entities may be able to

produce to rebut the administrative record or otherwise negate the proposition that they are

foreign terrorist organizations") (quoting *Nat'l Council for Resistance of Iran v. Dep't of State*,

251 F.3d 192, 209 (D.C. Cir. 2001)). In addition to post-designation notice and an opportunity to

present evidence in written form to rebut the basis for the designation, courts have required

OFAC to promptly provide the unclassified administrative record on which it relied in taking its

blocking action. *See Holy Land II*, 333 F.3d at 164 (stating due process requires disclosure of

the unclassified portions of the administrative record); *KindHearts for Charitable Humanitarian*

*Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 905 (N.D. Ohio 2009) ("OFAC, should, at the very

least, have promptly given KindHearts the unclassified administrative record on which it relied

in taking its blocking action.").

Here, based on the correspondence between OFAC and Mr. Zevallos, the Court finds that Mr. Zevallos was provided with adequate post-deprivation process.[16] Mr. Zevallos was provided with notice and an "opportunity to present, at least in written form, such evidence . . . to rebut the administrative record or otherwise negate the proposition" that he was an SFNT. *See Nat'l Council of Resistance,* 251 F.3d at 209. When Mr. Zevallos renewed his request for reconsideration in July 2009, OFAC asked Mr. Zevallos for more information via questionnaire, so that it could update its designation status of him. *See* AR001050-1053. Mr. Zevallos responded with a 12-page answer to OFAC's questions in November 2009. AR000958. He included in both the July 2009 and the November 2009 OFAC submissions the December 23, 2004, 32-page memorandum that he originally submitted to OFAC to contest his 2004 designation. *See* AR001233 n.6; AR001206, AR000969. The record shows that Mr. Zevallos thus received notice of his designation, and "submit[ted] arguments or evidence" that he believed "establishe[d] that insufficient basis exists for the designation" in accordance with 31 C.F.R. § 501.807(b). That OFAC did not ultimately agree with Mr. Zevallos's characterization of the evidence against him does not mean that he was not provided with due process in the wake of his 2009 request for reconsideration.

Mr. Zevallos further argues that OFAC's "failure to review [his] evidence supporting his delisting, as well as [its] unfailing silence over the years, surely does not represent a 'meaningful opportunity to be heard . . . .'" Pl.'s Opp'n Mot. to Dismiss 25. The Court finds the first argument unavailing. The record shows that OFAC did review Mr. Zevallos's submissions and

---

[16]     As set forth above, the 2004 designation is likely beyond the six-year statute of limitations. In addition, OFAC reasonably concluded that Mr. Zevallos abandoned contesting his 2004 designation when he voluntarily dismissed his previous suit. *See* AR001235, ECF No. 7-7; *Zevallos v. Bush*, Civ. No. 05-2196 (D.D.C. Dec. 21, 2005), ECF No. 7. Thus, the Court only considers the time period from 2009 through 2013, when Mr. Zevallos renewed his request for delisting.

evidence, given that it explained Mr. Zevallos's arguments and why those arguments were not persuasive in its 2013 Evidentiary Memorandum. *See* AR001238. OFAC's misplacement[17] of Mr. Zevallos's exhibits submitted with his December 23, 2004 memorandum did not affect its ability to consider the arguments and evidence contained in that 32-page memorandum in its 2013 decision. Specifically, OFAC considered the results of Mr. Zevallos's polygraph test, the other arguments he made in his December 23, 2004 letter, and his response to OFAC's 2009 questionnaire. *See* AR001238, AR001240–1241, AR001279, AR000958–969. In concluding that delisting Mr. Zevallos was not appropriate, OFAC stated, "[a]fter a thorough review of all the evidence, including that provided by [Mr. Zevallos] . . . there is a reasonable basis to determine that he merits continued listing" and he "has failed to demonstrate that an insufficient basis exists for the designation." *See* AR001272.

Mr. Zevallos's second argument regarding OFAC's "unfailing silence" is a closer call—though the Court ultimately finds no due process violation here either. Two courts have found procedural due process rights violations where OFAC has been dilatory in its response time. In *KindHearts*, for instance, the court found that OFAC's delay of fifteen months in providing the plaintiff with an evidentiary memorandum and evidence supporting its designation of an organization as a Specially Designated Global Terrorist violated the plaintiff's due process rights. 647 F. Supp. 2d at 903–904. The court explained that "promptness is an important aspect of the due process right to be heard." *Id.* at 906 (citing *Barry v. Barchi*, 443 U.S. 55, 64 (1979)). Employing the *Barchi* balancing test, the court went on to explain that OFAC waiting fifteen months, providing a largely uninformative, unclassified record to KindHearts, and losing a 1369-

---

[17]     The plaintiff has not specified how any evidence from the lost binders would have affected the outcome in this case. He can re-submit this new evidence in a new petition for reconsideration to OFAC, however, if he chooses.

page submission that KindHearts attached to its preliminary response did not provide KindHearts with a meaningful opportunity to be heard. *Id.* at 906–908.

In *Al Haramain*, OFAC waited seven months before giving Al Haramain a statement of reasons why it had been provisionally designated a terrorist organization under the IEEPA. 686 F.3d at 985–986. The Court found that the seven-month waiting period, combined with the fact that over a period of four years, OFAC only released "one document [that] could be viewed as supplying some reasons for OFAC's investigation and designation decision," failed to provide meaningful notice to Al Haramain. *Id.*

There are certainly similarities between the delays in *KindHearts* and *Al Haramain*, and in the present case. The Court notes that three years of radio silence from OFAC is troubling. From October 2009 to November 2012, Mr. Zevallos did not hear from OFAC, notwithstanding his writing at least two letters to OFAC seeking an answer to his request for reconsideration. *See* Pl.'s Opp'n Mot. to Dismiss 10; AR001236–1237 (chronicling Mr. Zevallos's and OFAC's correspondence in that time period). In addition, OFAC did misplace a volume of exhibits provided with Mr. Zevallos's initial December 23, 2004 submission.[18] AR001233 n.6.

*KindHearts* and *Al Haramain* are ultimately distinguishable, however, because those cases raise concerns about meaningful notice not present here. OFAC provided Mr. Zevallos with a redacted, unclassified version of exhibits in June 2005 and September 2005 (six months after a request was made), thus providing him with a basis from which to understand his designation, and thereby offer rebuttal arguments and evidence in response—which he did. *See, e.g.*, October 17, 2005 letter, AR001004; July 8, 2009 letter AR001203–1207, November 2, 2009

_____

[18]    Though again, the Court notes that the 2004 designation is not at issue here, and the loss of these exhibits does not really bear on the 2013 decision, because, as set forth above, OFAC was still able to consider the arguments Mr. Zevallos raised in the December 23, 2004, memorandum that he resubmitted in 2009, when it issued its 2013 decision.

letter, AR000958-969.  In contrast, the *KindHearts* and *Al Haramain* courts were troubled by the fact that the designated entities were left in the dark as to the reasons for their designations, and therefore could not meaningfully refute the evidence against them.  That was not the case for Mr. Zevallos, as he was able to proffer rebuttal evidence and arguments to OFAC to contest his designation.

Mr. Zevallos's meaningful opportunity to be heard is further evidenced by the 2009 questionnaire OFAC sent to him in response to his renewal of his reconsideration request, and his opportunity to respond to that.  *See* AR001236.  These facts make this case, therefore, more analogous to *Kadi*, 2012 WL 898778, at *24.  In *Kadi*, the court found that, notwithstanding OFAC's twenty-seven month delay in issuing a decision,[19] Kadi had a meaningful opportunity to be heard because he "availed himself of the opportunity to rebut the evidence he considered erroneous," and because he "did receive an opportunity, in substance, to rebut the evidence found in the unclassified record through his own submissions to OFAC, as well as the opportunity to respond robustly to OFAC's follow-up questions . . . ."  *Id.* at *24.  Similarly, Mr. Zevallos availed himself of the opportunity to rebut the evidence he considered erroneous, and "respond robustly to OFAC's follow-up questions" in his 12-page November 2009 questionnaire response, which included his December 23, 2004, 32-page memorandum of arguments and evidence refuting the evidence OFAC considered against him in its 2004 designation decision—all of which was considered by OFAC in reaching its 2013 decision.  Ultimately, Mr. Zevallos was given a meaningful opportunity to be heard by OFAC—that OFAC did not reach a favorable conclusion in a time frame Mr. Zevallos would have preferred does not make it violative of his constitutional rights.

---

[19]    Kadi petitioned OFAC for reconsideration on December 21, 2001, and OFAC issued a decision denying that request on March 12, 2004.  *Kadi*, 2012 WL 898778, at *2.

Finally, the Court notes that even if it found a due process violation based on delay, the error would nevertheless be harmless. *See, e.g.*, *Tennessee Secondary Sch. Athletic Ass'n v. Brentwood Acad.*, 551 U.S. 291, 303 (2007) (concluding that even if a school violated the plaintiff's procedural due process rights, such a violation was harmless beyond a reasonable doubt). Harmless errors have been characterized as those "small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Chapman v. California*, 386 U.S. 18, 22 (1967). Even if OFAC had issued a decision earlier than June 2013, it ultimately reached the same conclusion about Mr. Zevallos that it had reached in 2004—that he warranted designation as an SFNT. And Mr. Zevallos has provided no evidence indicating that he was prejudiced by any delay. OFAC considered the arguments Mr. Zevallos made in rebuttal to his designation and ultimately concluded that, "[a]fter a thorough review of all evidence, including that provided by [Mr. Zevallos . . . that Mr. Zevallos] has failed to demonstrate that an insufficient basis exists for the designation." AR001272. Mr. Zevallos has not provided any basis to conclude that a more prompt decision would have affected the outcome—as OFAC would still have designated Mr. Zevallos an SFNT in light of the substantial evidence it had against him. *Accord Al Haramain Found., Inc. v. Dep't of Treasury*, No. 07-115-KI, 2009 WL 3756363 (D. Or. Nov. 5, 2009), at *8–9, *rev'd on other grounds*, 686 F.3d 965 (9th Cir. 2011) (finding that "nothing [the designated entity] could have done would have changed the agency's decision"). *See also Al Haramain*, 686 F.3d at 990 ("Even if [the entity] had enjoyed better access to classified information and constitutionally adequate notice, we are confident that it would not have changed OFAC's ultimate designation determination.").

Though OFAC was not necessarily prompt in reaching its continued designation decision in 2013, Mr. Zevallos was given a meaningful opportunity to be heard.  *Mathews*, 424 U.S. at 333.  In the due process context, this is all the law requires.

### 2.  Substantive Due Process (Count II)

Mr. Zevallos also argues that OFAC violated his substantive due process rights because its denial of his delisting petition was "deliberately contrary to the law."  Pl.'s Opp'n Mot. to Dismiss 27.  In the D.C. Circuit, a plaintiff can show a substantive due process violation by showing a "grave unfairness" committed by government officials.  *Tri Cnty. Industries, Inc. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997).  There are two ways in which a plaintiff might show a "grave unfairness:" "(1) a substantial infringement of state law prompted by personal or group animus, or (2) a deliberate flouting of the law that trammels significant personal or property rights . . . ."  *Id.*

As set forth above, neither Mr. Zevallos's 2004 designation (to the extent it can, or even is being challenged here) nor his 2013 continued designation were arbitrary and capricious, nor did they violate Mr. Zevallos's procedural due process rights.  It would be a far stretch to say that notwithstanding those two findings, OFAC had committed a "grave injustice" against Mr. Zevallos.  *See also Holy Land I*, 219 F. Supp. 2d at 77 (finding that because the court had determined that OFAC's designation was not arbitrary and capricious under the APA, "it [is] clear that the agency action did not rise to the level of a [substantive due process] constitutional violation").  Therefore, the Court finds that without the requisite "grave injustice," Mr. Zevallos's substantive due process claim fails.

3. Takings (Count III)

Finally, Mr. Zevallos argues that the blocking of his assets contemporaneously with his SFNT designation amount to a taking without just compensation in violation of the Fifth Amendment. But Mr. Zevallos has not met his burden of establishing that this Court has jurisdiction over such a claim.

Under the Fifth Amendment, no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. The Tucker Act, 28 U.S.C. § 1491(a), provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution . . . ." As such, district courts have found that they lack subject matter jurisdiction to hear takings claims brought under the IEEPA. *See Kadi*, 2012 WL 898778, at *25; *Zarmach Oil Servs.*, 750 F. Supp. 2d at 159.

However, Mr. Zevallos alleges that this Court may have concurrent jurisdiction over his takings claim against the United States because the value of his blocked property *may* not exceed $10,000. *See* Pl.'s Opp'n Mot. to Dismiss 27 (emphasis added). 28 U.S.C. § 1346(a)(2) provides that "[t]he district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of [a]ny other civil action or claim against the United States, *not exceeding $10,000 in amount*, founded . . . upon the Constitution . . . ." (emphasis added). Again, it is the plaintiff's burden to establish subject matter jurisdiction, *see Lujan*, 504 U.S. at 561, and Mr. Zevallos's vague speculation fails to meet this criteria. The Court notes that in the 2007 Indictment from the U.S. District Court for the Southern District of Florida, the property value of houses either in Mr. Zevallos's name or control exceeds $700,000. *See* AR001058 at ¶ 7. It is therefore highly improbable that the value of his "taken" property falls below the statutory maximum for concurrent jurisdiction, signaling that Mr. Zevallos has not met his

burden of establishing that the Court has jurisdiction to hear his takings claim.  As such, the

Court must dismiss that claim for lack of subject matter jurisdiction under Fed. R. Civ. P.

12(b)(1).[20]

The defendants moved to dismiss, or in the alternative, for summary judgment on the due

process claims, and moved to dismiss for lack of subject matter jurisdiction, or in the alternative,

for failure to state a claim on the takings claim.  As set forth above, the Court enters judgment

for OFAC on the procedural and substantive due process claims (Counts I & II), and dismisses

the takings claim (Count III) under Fed. R. Civ. P. 12(b)(1).

## IV.  CONCLUSION

For the foregoing reasons, the defendants' motion is GRANTED.  An order consistent

with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 17, 2014                                      RUDOLPH CONTRERAS
                                                             United States District Judge

---

[20]       Even if the Court did have subject matter jurisdiction to hear Mr. Zevallos's
takings claim, however, it is unclear that he would prevail on the merits, as this court has held
that "a blocking of assets pursuant to an executive order is not a taking within the meaning of the
Fifth Amendment."  *Zarmach Oil Servs., Inc. v. Dep't of Treasury*, 750 F. Supp. 2d 150, 159
(D.D.C. 2010) (citing *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34,
51 (D.D.C. 2005), *aff'd in part, remanded on other grounds*, 477 F.3d 728 (D.C. Cir. 2007)).